**HOME SAVINGS AND LOAN ASSOCIATION, Plaintiff-Appellee,**

v.

**UNITED STATES of America, Defendant-Appellant.**

**No. 73-2690.**

United States Court of Appeals, Ninth Circuit.

April 16, 1975.

As Amended on Denial of Rehearing En Banc June 16, 1975.

**1200**

Ernest J. Brown, Atty., Tax Div., Dept. of Justice (argued), Washington, D. C., for defendant-appellant.

Bruce I. Hochman (argued), Los Angeles, Cal., for plaintiff-appellee.

### OPINION

Before GOODWIN and SNEED, Circuit Judges, RENFREW,* District Judge.

SNEED, Circuit Judge:

The Home Savings and Loan Association seeks a refund of income taxes which it paid as the transferee of the assets of Pasadena Savings and Loan Association and Savings and Loan Association of Anaheim pursuant to Notices of Deficiency issued on December 10, 1962. The Notice relating to Pasadena was based upon a restoration to the taxable period, January 1, 1956 to March 12,

1956, of the sum of $5,281,452.87. This sum represents the total of that portion of Pasadena's bad debt reserve previously deducted from taxable income during Pasadena's taxable years 1952 through 1955 and the period of January 1, 1956 to March 12, 1956, and the additional sum of $436,121.63, consisting of income earned but not collected by Pasadena, a cash basis taxpayer, during the period January 1, 1956 to March 12, 1956. The Notice relating to Anaheim followed a similar pattern. That is, it was based upon a restoration to Anaheim's income for its taxable period January 1, 1956 to July 11, 1956 of the sum of $1,087,563.39. This sum represents that portion of Anaheim's bad debt reserve deducted during Anaheim's 1952 through 1955 taxable years and the period of January 1, 1956 to July 11, 1956, and the additional sum of $88,089.88, consisting of income earned but not collected by Anaheim, a cash basis taxpayer, during the January 1 to July 11, 1956 period. The question before us is whether these additions to the income of Pasadena and Anaheim are proper. The district court held them improper and entered judgment for Home Savings and Loan Association. We disagree. Therefore, we reverse and deny the refund sought by Home.

### I.

*The Issue.*

Home and the Government agree that the correctness of these additions to the income of Pasadena and Home depends upon whether certain transactions, described more fully hereafter, resulting in the acquisition by Home of all the assets of Pasadena and Anaheim, as well as the assumption of all their liabilities, constituted reorganizations within the meaning of Section 368(a)(1)(A) of the Internal Revenue Code of 1954. Characterization of the transactions as reorganizations renders the additions to income improper. Although Home argues to the contrary, the Government insists that the failure to so characterize them requires a

---

* Honorable Charles B. Renfrew, United States District Judge, Northern District of California, sitting by designation.

denial of Home's claim for refund. As will appear below, we believe the Government's view is correct and so hold. Therefore, the principal, if not the sole issue before us, is whether the transactions in question amounted to such a reorganization.

To better grasp the significance of this issue as it relates to the transactions before us and the respective contentions of Home and the Government it will be useful to examine the tax consequences of two paradigmatic transactions. In the first Corporation A, a cash basis taxpayer, having only common stock authorized and issued, pursuant to the applicable state law, enters into an agreement to merge with Corporation B, which also only has common stock authorized and outstanding and which is to be the surviving Corporation. A and B are engaged in the same trade or business which will be carried on by B following the reorganization. The agreement provides that the common stockholders of A will become common stockholders of B in a manner that accurately reflects the value of their equity interest in Corporation A. The merger resulting from the performance of this agreement will be considered "a statutory merger or consolidation" and thus a "reorganization" within the meaning of Section 368(a)(1)(A) of the 1954 Code. Because the equity interest of the shareholders of A is recognized and continued in B the so-called continuity of interest test is met. See Pinellas Ice and Cold Storage Co. v. Comm'r., 287 U.S. 462, 53 S.Ct. 257, 77 L.Ed. 428 (1933); Treas.Reg. § 1.3681(b) and (c); Bittker and Eustice, Federal Income Taxation of Corporations and Shareholders, ¶ 14.11, 14.12 (3rd ed. 1971). As a consequence, the stockholders of A are not required to recognize gain or loss on the exchange of A stock for B stock (§ 354(a)(1) Int.Rev.Code of 1954); the tax basis of the assets acquired by B will be the same as in the

hands of A (§ 362(b) Int.Rev.Code of 1954); and, under certain circumstances, the accounting method of A continues as the method employed by B (§ 381(c)(4) Int.Rev.Code of 1954) with the result that a reserve for bad debts established by A will be carried over to B (Treas. Reg. § 1.381(c)(4)–1(b)(1) Example (1)). Under such circumstances additions to the income of A, such as urged by the Government here in its Notices of Deficiency to Home, would be improper.

■ To be contrasted with the merger of Corporation A into Corporation B is the acquisition of the assets and the assumption of liabilities of Corporation A by Corporation B in which transaction the shareholders of A receive the value of their equity in cash. Such a transaction is a sale. It can take two forms, viz. the sale of assets by A to B followed by the liquidation of A in which A's shareholders receive the sale proceeds in exchange for their stock, or the sale by A's stockholders of their stock for cash to Corporation B which shortly thereafter liquidates A and acquires its assets and assumes its liabilities in exchange for the recently acquired A Corporation stock. The tax consequences of these two forms of acquiring the assets of Corporation A may be arranged so as to be substantially equivalent. The shareholders of A recognize gain or loss on the receipt of cash in exchange for their stock (§ 61 and § 331 Int.Rev.Code of 1954), the tax basis of the assets of A in the hands of Corporation B is adjusted to reflect the cash paid and liabilities assumed by B (§ 1012 and § 334(b)(2) Int.Rev.Code of 1954), and such additions to income of A as suggested by the Government in its Notices of Deficiency are proper. Arcadia Savings and Loan Association v. Comm'r., 300 F.2d 247 (9th Cir. 1962); West Seattle National Bank of Seattle v. Comm'r, 288 F.2d 47 (9th Cir. 1961); Idaho First National Bank v. United States, 265 F.2d 6 (9th Cir. 1959); [1] Rev.Rul. 65–258, 1965—2 C.B.

---

1. Home appears not to assert that Comm'r v. South Lake Farms, Inc., 324 F.2d 837 (9th Cir. 1963) makes the accrual of earned but not received income improper. We agree with the position because Idaho First National Bank v. U. S., 265 F.2d 6 (9th Cir. 1959) is the controlling precedent. Nothing in this opinion is intended, however, to impair the authority of South Lake Farms.

94. Our holdings in Calavo Inc. v. Comm'r., 304 F.2d 650 (9th Cir. 1962) and Schmidt v. Comm'r., 355 F.2d 111 (9th Cir. 1966), which was approved by the Supreme Court in Nash v. United States, 398 U.S. 1, 5, 90 S.Ct. 1550, 26 L.Ed.2d 1 (1970), are not to the contrary. These cases did not involve sales. They involved instances in which a continuity of ownership and business enterprise unmistakably existed.

In this case the Government contends that Home's acquisition of Pasadena and Anaheim more nearly resembles the purchase by Home of the stock of Pasadena and Anaheim followed by their liquidation by Home. Home, on the other hand, insists that its acquisition of Pasadena and Anaheim was by way of reorganization. The precise facts of the transactions before us reveal that they do not conform neatly to either paradigm; but, as we shall show, their resemblance to the stock purchase—liquidation variation of the second paradigmatic example is substantially greater than is their resemblance to a "reorganization" within the meaning of Section 368(a)(1)(A) of the Internal Revenue Code of 1954. We now turn to the details of the transactions before us in this case.

## II.

### The Facts.

A. The financial structure of Pasadena, Anaheim, and Home.

On March 12, 1956, the date on which Pasadena was absorbed by Home, Pasadena had outstanding a total of 20,000 shares of guarantee stock and 650,252 withdrawable shares, consisting of 31,130 full paid and 619,122 as cumulative shares. Under California law as of March 12, 1956 the term "stock" embraced only "guarantee stock" and the proceeds from the issuance of such stock were required to be "set apart" and "maintained as a fixed and permanent capital of the association." [2] "Shares," on the other hand, "means withdrawable shares of an association," § 5067 Ca.Fin. Code, which in 1956 could be issued as "fully paid shares, installment shares, accumulative shares [or] prepaid shares." [3] Each such share entitles its holder to share in the profits of the association [4] and to withdraw his investment upon proper notice. [5] Although the directors of Pasadena were elected by stockholders and shareholders, the stockholders, the holders of guarantee stock, elected the majority of the board of directors. [6] The powers of the directors included, *inter*

2. § 5068 Ca.Fin.Code provides, " 'stock' means guarantee stock of an association." § 6456 Ca.Fin.Code, as of 1956, read: "Guarantee stock shall be of one class. Guarantee stock shall have a par value of not less than ten dollars ($10) per share. The proceeds from the sale of the guarantee stock shall be set apart to the extent of the par value and, except as that stock is reduced as provided in this chapter, shall be maintained as a fixed and permanent capital of the association." See ch. 364, § 6456, 1951 Ca.Stat. 1000, as amended Ca.Fin.Code § 6456 (1963).

3. Ch. 364, § 6506, 1951 Ca.Stat. 1001, as amended Ca.Fin.Code § 6506 (1967).

4. § 6507 Ca.Fin.Code (full paid shares); § 6508 Ca.Fin.Code (installment shares); § 6509 Ca. Fin.Code (accumulative shares); § 6510 Ca. Fin.Code (prepaid shares).

5. Article XV, captioned "Withdrawals," of the By-Laws of Pasadena provided: "The Association hereby prescribes six months written notice as the period of notice of intention to withdraw, which this Association at its option may require of all shareholders and certificate holders. In respect of all withdrawals, notice of intention to withdraw must be given, and all withdrawals be made in accordance with the provisions of the California Building and Loan Association Act, and any Acts amendatory thereof and supplemental thereto.

6. Article V, Section 1 of the Pasadena By-Laws provided: "The directors shall be elected annually by the stockholders and shareholders at the annual meeting of the stockholders and shareholders, provided, however, that a majority of the Board of Directors shall be elected by the stockholders . . .."

The terms "stockholder" and "shareholders" in the By-Laws had the same meaning as such terms had under the applicable California law. The sharp distinction between "stock" and "shares" which exists in the law relating to building and loan associations was recognized in In the Matter of Mulkind and Crawford Electric Co., 145 F.Supp. 146 (S.D.Ca.1956)

*alia,* the power "to change the rate of dividends on shares and guarantee stock from time to time . . .."[7] Moreover, the directors could force the retirement of withdrawable shares.[8]

The capital structure of Home at the time it acquired Pasadena and Anaheim was similar to Pasadena's. That is, there existed guarantee stock and withdrawable shares designated by Home's By-Laws as "membership shares."[9] The majority of the board of directors was elected by the holders of guarantee stock and the board fixed the dividends payable on stock and shares.[10] "Membership shares" could be retired by the board and were withdrawable upon notice by their holder.[11] Restrictions on withdrawal rarely were imposed.

On July 11, 1956, the date of Home's absorption of Anaheim, there were outstanding 1,000 shares of Anaheim guarantee stock and 177,365 fully paid and accumulative investment certificates held by approximately 6,800 depositors. Investment certificates, in contrast to withdrawable shares, are entitled by statute to earn interest[12] and "are not liable for debts or assessments, and are entitled upon liquidation of an association to receive payment in full before any payment or distribution is made to shareholders or stockholders." § 6550 Ca.Fin.Code. Certificate holders possess no voting rights except as expressly provided in the By-laws. § 7653 Ca.Fin. Code. The record does not contain the By-Laws of Anaheim, but it is stipulated that holders of investment certificates were not entitled to vote on the merger or with respect to other corporate affairs of Anaheim.

**B. Home's acquisition of Pasadena and Anaheim.**

Home acquired Pasadena in the following manner. On January 11, 1956, Home purchased for cash 20,000 shares of guarantee stock of Pasadena from Pasadena's guarantee stockholders. This constituted the entire amount of guarantee stock outstanding. The cash payment amounted to $8,031,107 and payment was completed in February 1956. Pursuant to California law, a proposed merger of Pasadena into Home was approved by the California Savings and Loan Commissioner on January 13, 1956, subject to the consent of the guarantee stockholders and withdrawable shareholders of both corporations holding in the aggregate not less than two-thirds of the outstanding guarantee stock and not less than two-thirds in value of the outstanding withdrawable shares of each corporation.

The favorable vote was overwhelming. Home voted 100% of Pasadena's guarantee stock and of Pasadena's 650,252 withdrawable shareholder votes, 500,809 were cast for the merger of which all but 155 were by proxy. Of Home's 672 guarantee stockholder votes, 644 favored the merger as did 2,225,438 of the 2,266,660 withdrawable shareholder votes.

Under the terms of the March 12, 1956 merger of Pasadena into Home the guarantee stock of Pasadena then held by Home was surrendered and cancelled. Withdrawable shares of Pasadena were eligible to be surrendered and cancelled in exchange for a withdrawable share in Home for the same amount as evidenced by the surrendered Pasadena share. New signature cards on Home forms were to be obtained from those who exchanged their Pasadena shares for Home shares. As a consequence of these terms, 97.2% of Pasadena's withdrawable shares were converted into withdrawable shares of Home.

Home's acquisition of Anaheim proceeded in a similar manner. Thus, be-

---

**7.** Article VII, section 1, paragraph Eight, Pasadena By-Laws.

**8.** Article XIV, Pasadena By-Laws.

**9.** Article III, section 2, By-Laws of Home Savings and Loan Association.

**10.** Article IV, section 2 (election of majority of board by stockholders) and Article IX, section 2 (fixing of dividends by board of directors) of By-Laws of Home Savings and Loan Association.

**11.** Article IX, sections 4 and 5, By-Laws of Home Savings and Loan Association.

**12.** § 6552, § 7400 Ca.Fin.Code.

tween May 23 and July 9, 1956 Home acquired for cash every share of Anaheim's guarantee stock. The purchase price was $2,260,729 and the acquisition was recorded in Home's books as an investment in Anaheim's guarantee stock. The California Savings and Loan Commissioner approved a proposed merger of Anaheim into Home on June 13, 1956 provided it was approved by the guarantee stockholders of Anaheim and the guarantee stockholders and withdrawable shareholders of Home holding not less than two-thirds of the outstanding guarantee stock of each corporation and not less than two-thirds in value of Home's outstanding withdrawable shares. Anaheim's investment certificate holders, of course, were not entitled to vote on this matter.

Again, not surprisingly, the favorable vote was overwhelming. Each share of Anaheim's guarantee stock was cast in favor of the merger; 644 of Home's 672 guarantee stockholder votes were similarly cast, and approximately 87% of Home's withdrawable shares supported the merger.

The merger was accomplished on July 11, 1956 pursuant to which the guarantee stock of Anaheim was surrendered and cancelled and all investment certificates of Anaheim were exchanged for withdrawable shares in Home in the same amount as the surrendered investment certificates. New signature cards were executed for Anaheim's former certificate holders and the cancelled certificates were returned to such holders. The record does not reveal how many investment certificates were so exchanged and surrendered.

Following each of these mergers the business of Pasadena and Anaheim was operated by Home without interruption on the same premises each previously occupied.

Home on its books treated the merger as the acquisition of the assets and assumption of liabilities of Pasadena and Anaheim. That is, the $8,031,107 paid to Pasadena's guarantee shareholders was apportioned among Pasadena's assets in the manner set forth in the margin.[13] The $2,260,729.00 paid to Anaheim guarantee stockholders was apportioned in a similar manner.[14] The liabilities of Pasadena and Anaheim assumed by Home obviously included the amounts invested by the withdrawable shareholders and investment certificate holders respectively.

C. Sources of the Pasadena and Anaheim income on which rest the notices of deficiency.

13. Home assumed Pasadena liabilities in the amount of $73,618,153.42 and paid $8,031,-107.19 for the guarantee stock. Treating these two amounts as the purchase price of Pasadena, their total is $81,649,260.61. Pasadena's assets in part consisted of cash or its equivalent of $8,798,208.89. This amount of the total purchase price was apportioned to cash or its equivalent and the balance thereof, $72,851,-051.72 was apportioned to the remaining assets in the following manner:

| | Amount | Fair Market Value | Apportioned Amount |
|---|---|---|---|
| F.H.A. Insured Loans | $ 2,529,067.14 | $ 2,427,904.45 | $ 2,529,902.33 |
| V.A. Guaranteed Loans (1st) | 42,044,533.93 | 38,680,971.19 | 40,305,984.51 |
| V.A. Guaranteed Loans (2nd) | 124,215.17 | 114,277.96 | 119,078.85 |
| Conventional Loans | 28,028,006.72 | 28,028,006.72 | 29,205,481.92 |
| Real Estate Owned | 29,899.84 | 29,899.84 | 31,155.95 |
| Office Building | 293,466.72 | 543,466.72 | 566,298.12 |
| Furniture, Fixtures, Equipment | 89,394.47 | 89,394.47 | 93,150.04 |
| | $73,138,583.99 | $69,913,921.35 | $72,851,051.72 |

Home divided the amount to be apportioned ($72,851,051.72) by the total fair market value of the assets ($69,913,921.35), and multiplied that by the fair market value of each item.

*Example*

$$\frac{\$72,851,051.72}{69,913,921.35} \times \$2,427,904.45 = \$2,529,902.33$$

14. Anaheim liabilities assumed by Home amounted to $21,525,692.42. The cash payment plus assumed liabilities equals $23,786,-421.42, the total purchase price. Assets consisting of cash or its equivalent held by Anaheim amounted to $2,361,777.01. The balance of the purchase price, $21,424,644.41 ($23,786,-421.42—$2,361,777.01) was apportioned to Anaheim's remaining assets in the following manner:

| | Amount | Fair Market Value | Apportioned Amount |
|---|---|---|---|
| F.H.A. Insured Loans | $ 418,918.34 | $ 402,161.61 | $ 412,017.12 |
| V.A. Guaranteed Loans | 1,810,503.89 | 1,665,663.58 | 1,706,482.91 |
| All other Loans | 18,164,988.54 | 18,164,988.54 | 18,610,146.02 |
| Real Estate Sold on Contract | 213,183.50 | 213,183.50 | 218,407.85 |
| Real Estate Owned | 1,414.64 | 98,600.00 | 101,016.33 |
| Office Building | 157,788.33 | 257,598.56 | 263,911.36 |
| Furniture and Fixtures | 109,967.92 | 109,967.92 | 112,662.82 |
| | $20,876,765.16 | $20,912,163.71 | $21,424,644.41 |

Home divided the amount to be apportioned ($21,424,644.41) by the total fair market value of the assets ($20,912,163.71), and multiplied that by the fair market value of each item.

*Example*

$$\frac{\$21,424,644.41}{\$20,912,163.71} \times \$402,161.61 = \$412,017.12$$

■■ During the taxable years 1952 through that portion of 1956 preceding the merger, Pasadena and Anaheim reduced or eliminated their income tax liability by claiming bad debt deductions allowable under the then existing section 593 of the Internal Revenue Code of 1954 or its predecessor, section 23(k)(1) of the Internal Revenue Code of 1939 as amended effective January 1, 1952. The pattern of these deductions, as well as the amount with respect to such deductions sought to be restored to income by the Notices of Deficiency is reflected by the following table:

### Pasadena

| | Income Before Bad Debt Deduction | Bad Debt Deduction | Income After Bad Debt Deduction | Amount Restored to Income |
|---|---|---|---|---|
| 1952 | $ 466,341.53 | $ 466,341.53 | none | $ 466,341 53 |
| 1953 | 968,904.41 | 968,904.41 | none | 968,904.41 |
| 1954 | 1,382,121.91 | 1,382,121.91 | none | 1,382,121.91 |
| 1955 | 1,911,580.53 | 1,911,580.53 | none | 1,911,580.53 |
| 1956 | 552,504.49 | 552,504.49 | none | 552,504.49 |
| | $5,281,452 87 | $5,281,452.87 | | $5,281,452.87 |

### Anaheim

| | Income Before Bad Debt Deduction | Bad Debt Deduction | Income After Bad Debt Deduction | Amount Restored to Income |
|---|---|---|---|---|
| 1952 | $ 135,787 05 | $ 110,787.05 | $ 25,000.00 | $ 110,787.05 |
| 1953 | 157,980 06 | 132,980.06 | 25,000.00 | 132,980.06 |
| 1954 | 215,956.76 | 190,956.76 | 25,000.00 | 190,956.76 |
| 1955 | 362,660.65 | 337,660.65 | 25,000.00 | 337,660.65 |
| 1956 | 315,178.87 | 315,178.87 | none | 315,178 87 |
| | $1,187,563.39 | $1,087,563.39 | $100,000.00 | $1,087,563.39 |

Following the merger Home failed to add the bad debt reserves of Pasadena and Anaheim to its reserve. In addition, it reported the receipt of income earned but not collected by Pasadena and Anaheim during 1956 as a non-taxable return of capital.

Home now acknowledges that its apportionment of the purchase price of Pasadena and Anaheim to their respective assets is not compatible with its present contention that its acquisition of these associations was a reorganization. It also recognizes that its failure to add the bad debt reserves of Pasadena and Anaheim to its own and to report the earned but uncollected income as its own was erroneous if the transactions are to be characterized as reorganizations.

### III.

#### Analysis and Conclusion

A. Sections 334(b)(2) and 368(a)(1)(A).

As already indicated, we believe that Home's initial treatment of these transactions was proper and that its acquisition of Pasadena and Anaheim should be treated for federal income tax purposes as the purchase by Home of the entire outstanding stock of Pasadena and Anaheim followed by a complete liquidation which, under Section 334(b)(2) Internal Revenue Code of 1954, permits the basis of the assets acquired to be computed by reference to the adjusted basis of the acquired stock adjusted for liabilities assumed.[15] Home strongly asserts that section 334(b)(2) is inapplicable because it did not acquire by purchase "at least 80 percent of the total combined voting power of all classes of stock entitled to vote, and at least 80 percent of the total number of shares of all other classes of stock" within the time period provided by the provision. Its purchase, it insists, was limited to the guarantee stock; its acquisition of the withdrawable shares and investment certificates, amounting to far more than 20 percent of the total voting power and number of shares, was by way of a "reorganization" within the meaning of section 368(a)(1)(A). Internal Revenue Code of 1954. We thus confront the question whether the withdrawable shares and investment certificates must be considered as "stock." If not considered "stock," for the purposes of sections 334(b)(2) and 368(a)(1)(A), it follows they represent a form of debt. Classification as debt enables Home's acquisition of the guarantee stock to meet the 80 percent test.

Classification as debt, moreover, prevents Home's acquisitions from qualifying as a Type A reorganization. The elimination of all "stockholders" of Pasa-

---

15. For a description of the manner in which the adjusted basis of the stock is adjusted for unsecured liabilities for purposes of its apportionment to the assets of the acquired and liquidated corporation, *see* Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, § 11.44 (3rd ed. 1971). This illustration is in accord with the technique employed by Home and set forth in footnotes 13 and 14.

dena and Anaheim by means of purchase results in an insufficient continuity of interest within the meaning of Treas. Reg. § 1.368–1(b) and (c) (1960). Under such circumstances there can be no continuity of interest "on the part of those persons who, directly or indirectly, were the owners of the enterprise prior to the reorganization." Treas.Reg. § 1.368–1(b). Also, the holding of Nelson v. Helvering, 296 U.S. 374, 56 S.Ct. 273, 80 L.Ed. 281 (1944) that non-voting preferred stock was equity and sufficient to satisfy the continuity of interest requirement becomes inapplicable. However, classification of the withdrawable shares of Pasadena and the investment certificates of Anaheim as equity provides the means by which the continuity of interest doctrine is easily satisfied.

B. Withdrawable shares and investment certificates are debt and not equity.

Neither withdrawable shares nor investment certificates under the circumstances of this case partake sufficiently of equity characteristics to permit their classification as such. To distinguish debt from equity it is necessary to examine carefully not only the characteristics of the instruments in question but also those of interests which occupy adjacent positions in the debt-equity spectrum. In this instance this means comparing withdrawable shares and investment certificates with guarantee stock on the one hand and an ordinary savings account and the claims of general creditors on the other hand. Such a comparison, enlightened by an examination of (1) the terms of withdrawable shares, investment certificates, guarantee stock and open account debts, (2) certain aspects of relevant California law, (3) certain features of the federal income tax treatment, and (4) the published work of authorities, convinces us that withdrawable shares of Pasadena and Home and the investment certificates of Anaheim should be classified as debt.

1. Terms of shares and certificates.

The facts of this case already set forth leave little to be said regarding the terms of these instruments. Their holder could realize cash virtually on demand. The holders of guarantee stock had no such rights. In the case of withdrawable shares the earnings thereon were not fixed but were subject to determination by the board of directors, the majority of which were elected by the guarantee stockholders. The absence of a fixed rate of return, the limited voting rights accorded such shares by Pasadena and Home, and the right to share in the proceeds upon liquidation, are the footings upon which Home attempts to build its case. They will not support the burden. Holders of debt can be accorded voting rights, Ca.Corp.Code § 306, and the competition for savings with commercial banks will assure withdrawable shareholders a reasonably steady rate of return. While we might be willing to weigh more heavily such equity-like features were there no greater equity-like interests involved, that is not the case here. Neither Home, Pasadena, nor Anaheim were mutual savings and loan associations. Each utilized guarantee stock; it was the true equity interest of these associations.

Our interpretation is consistent with the spirit in which this circuit approached the task of determining whether certain fees paid to a corporation constituted taxable income to the corporation or a contribution capital. Although the payor of the fees obtained a right to vote for the management of the corporation and right to share in the assets upon liquidation, this court in Affiliated Government Employees Distributing Company v. Commissioner, 322 F.2d 872 (9th Cir. 1963) examined the context within which these rights existed and concluded that the payments were for the privilege of buying goods at a discount. As such they were taxable income. In this case, as in Affiliated Government Employees, we refuse to be deflected from a proper holding by the broad language of Section 7701(a)(7), Internal Revenue Code of 1954, which defines the term "stock" to include "shares in an association." As Judge Hamlin observed in Affiliated Govern-

*ment Employees*, "in applying the income tax laws we must regard matters of substance and not mere form." 322 F.2d at 877.

The collapse of Home's argument that withdrawable shares under the circumstances of this case constitute equity is not prevented by reference to Anaheim's investment certificates. Although these certificates possess more debt-like characteristics than do shares, these differences are not sufficient to warrant moving the equity boundary so as to embrace shares and exclude certificates. Both more resemble savings deposits than equity.

2. Relevant aspects of California Law.

This resemblance is made unmistakable when certain provisions of the California law relating to savings and loan associations are considered. Of primary importance are the distinctions drawn by California between the liability to creditors of stockholders on the one hand and shareholders and holders of certificates on the other. Stockholders, as a general rule, are individually liable for the debts (including investment certificates) of their associations "to the extent of the amount set aside from the sale of such stock as fixed and permanent capital of the association pursuant to Section 6456 of the Financial Code, in addition to the amount invested in stock." Ca.Fin.Code § 8450. Although this liability may be terminated under certain conditions, Ca. Fin.Code § 8403, it stands in sharp contrast to the sweeping pronouncement found in Section 8401 of the Financial Code which provides: "Shareholders, certificate holders and borrower members are not liable to creditors nor for assessments." This sharp contrast was observed many years ago by the Supreme Court of California when it held that withdrawable (membership) shareholders were creditors of an association having guarantee stockholders and entitled to a priority on liquidation inferior only to general creditors and certificate holders and superior to guarantee stockholders. In re Pacific Coast Building-Loan Ass'n.,

15 Ca.2d 134, 99 P.2d 251 (1940). Moreover, the Court held withdrawable shareholders were entitled to be paid the principal amount of their claims before interest was payable to investment certificate holders to cover the period of liquidation. The Court observed that "membership [withdrawable] shares are fundamentally similar to the investment certificates." 15 Ca.2d at 144, 99 P.2d at 255. This fundamental similarity is also reflected in Ca.Fin.Code § 9055.5, which treats shareholders and certificate holders on the basis of substantial parity with respect to the payment of interest during liquidation. Further recognition appears in Ca.Fin.Code § 7616, which bars both types of interests from instituting or maintaining a derivative action on behalf of their association. Only stockholders may maintain such actions.

Perhaps the most compelling indication that withdrawable shares are properly treated as debt is California's statutory definition of impairment of capital appearing in Section 8500 of the California Financial Code. It reads:

> If the value of the assets of an association after deducting the amount of liabilities of the association, including the value of its outstanding investment certificates and shares, is less than the aggregate par value of the association's outstanding stock, or, if the stock is without par value, less than the amount fixed therefor in the association's articles of incorporation, the capital of the association shall be deemed to be impaired for the purposes of this article.

The value of shares and certificates *are* liabilities for this purpose. Clearly we are at peace with California law when we treat them as debt and not equity (stock) for our purposes.

3. Relevant aspects of Tax Law.

Our holding is also in accord with the treatment of savings and loan associations under the Internal Revenue Code of 1954. Section 591, for example, permits the deduction of amounts paid with respect to "deposits or withdrawable accounts" provided such amounts "are

withdrawable on demand subject only to customary notice of intention to withdraw." Dividends paid with respect to guarantee stock, however, are not deductible. Treas.Reg. § 1.591–1(a)(2) (1956). The dividend received credit and exclusion available in 1956 was inapplicable to dividends allowed as a deduction under Section 591. Treas.Reg. § 1.34–3(b)(2) (1956), as amended TD 6500 (1960). Of significance is the fact that "deposits and withdrawable accounts" are treated alike in measuring one of the limits placed upon "the reasonable addition for the taxable year to the reserve for bad debts." Section 593(b)(1)(B) provides that the addition to the bad debt reserve under certain circumstances shall not exceed "the amount by which 12 percent of the total deposits or withdrawable accounts of depositors" exceeds the association's surplus, undivided profits, and reserves at the beginning of the year. Clearer evidence that withdrawable shares are deposit-like debt is hard to imagine.

4. Textbook Writers.

Support for this view also can be found in the writings of those experienced in the savings and loan industry. Russell, for example, in discussing how the industry met the challenge in 1951 of the repeal of its tax exemption pointed out that it was recognized by at least some that a deduction for the "cost of money" would have to be provided. As he put it:

It may be worthwhile to point out, also, that during the years of the study of this question the fact was not overlooked that if the Congress subjected the associations to full income taxation, after expenses only, excluding the cost of money, called a dividend, then within a few months we could reorganize all of the associations so as to make their cost of money interest as it is in banks on savings accounts so that it would be deductible

before tax. If we had lost our case, this would have been done.

Horace Russell, Savings and Loan Associations 132 (2d ed. 1960).

As Section 591 of the Revenue Code indicates, Mr. Russell's view prevailed; a deduction for the "cost of money" was allowed; and the industry did not face the necessity of restructuring itself. Prather also recognizes that the ownership in accounts in savings associations whether in the form of withdrawable shares or investment certificates, more nearly resembles ownership of a savings deposit than a share of stock. Prather, Savings Account, 296–7 (4th ed. 1970).

C. Comments on *Everett*.

We shall close by commenting briefly on Everett v. United States, 448 F.2d 357 (10th Cir. 1971), relied on heavily by Home.[16] Superficially, Everett appears at odds with our holding here. The Government asserts that it is distinguishable because of the fact that, under then existing Kansas law, full paid shares and savings shares had rights more extensive than did the shareholders and certificate holders in Pasadena and Anaheim. We express no opinion on this assertion beyond recognizing that the presence of such more extensive rights can approach the point at which all difference between such shares and so-called permanent shares or guarantee stock disappears. In such cases debt and equity become indistinguishable. Moreover, we also recognize that the statutory merger of two associations whose debt and equity are indistinguishable, as perhaps in the case of two mutual savings associations, raises issues different from those before us here. Under such circumstances a spectrum of interests may vanish leaving only one broad and uniform band to depict the only interest that can exist. Assuming that there must exist in all associations a proprietary interest, such broad and uniform interest may well serve that purpose.

---

**16.** Home also relied heavily on Home Savings and Loan Association v. United States, 223 F.Supp. 134 (S.D.Cal.1963) which involved an acquisition by Home substantially identical to that presently before us. The result reached and reasoning employed in that case is inconsistent with our holding and reasoning in this case.

Its capacity to do so should not be impaired by the fact that it also may constitute debt.[17] However this may be, we are not confronted here with such a case.

17. Without expressing an opinion on the correctness of the result reached in West Side Federal Savings and Loan Association of Fairview Park v. United States, 494 F.2d 404 (6th Cir. 1974), it should be pointed out that the dual character of mutual shares was recognized in that case. 494 F.2d at 409.