HAROLD T. AND MARIE B. PAULSEN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 17549–79.     Filed March 2, 1982.

*Duane Tewell* and *David Tewell*, for the petitioners.
*Wayne R. Appleman*, for the respondent.

OPINION

FEATHERSTON, *Judge*: Respondent determined a deficiency in the amount of $40,913 in petitioners' Federal income tax for 1976. The only issue for decision is whether the exchange of "guaranty stock" in a State-chartered savings and loan association for passbook accounts and time certificates of deposit in a federally chartered mutual savings and loan

association qualifies as a tax-free exchange under section 354(a).[1]

This case was submitted fully stipulated.

At the time the petition was filed, petitioners Harold T. and Marie B. Paulsen, husband and wife at all times material herein, resided in Tacoma, Wash. They filed a joint Federal income tax return for 1976 with the Internal Revenue Service Center, Ogden, Utah.

During the 12-month period preceding June 30, 1976, petitioner Harold T. Paulsen was the president and a director of Commerce Savings & Loan Association of Tacoma (Commerce). Commerce, a State-chartered savings and loan association, was incorporated and operated under the laws of the State of Washington.

Under its articles of incorporation and bylaws, Commerce was authorized to issue "guaranty stock" and several classes of savings accounts. Each holder of a savings account or guaranty stock, as well as each borrower, was a "member" of Commerce. With respect to all questions requiring action by the members, holders of savings accounts received one vote for each $100 in their accounts, and guaranty stockholders received one vote per share of stock. Each borrower from Commerce was also entitled to one vote. A majority of the board of directors of Commerce were required to be owners of guaranty stock.

A minimum amount of guaranty stock, specified by a formula, was required to be "maintained as fixed and permanent nonwithdrawable capital" of Commerce. Guaranty stockholders had a proportionate proprietary interest in the assets and net earnings of Commerce subordinate to the claims of its creditors; no other member had such an interest.[2] Guaranty stock was not eligible as security for loans from Commerce,

---

[1] All section references are to the Internal Revenue Code of 1954 as in effect during the tax year in issue, unless otherwise noted.

[2] The bylaws submitted with the stipulation state that "each holder of a savings account or guaranty stock" shall have a proportionate proprietary interest in the assets or net earnings. However, they further state that any provision of the bylaws in conflict with State law "shall be deemed amended to conform therewith." During the years in question, Wash. Rev. Code Ann. sec. 33.48.080 (Supp. 1981), provided as follows:

"Each member having guaranty stock in an association shall have a proportionate proprietary interest in its assets and net earnings subordinate to the claims of its creditors * * * ; but [subject to an exception not pertinent here] no other member * * * shall have any such interest * * * "

and it could not be "withdrawn" until the claims of all creditors and holders of savings accounts had been satisfied upon liquidation or dissolution. Dividends on guaranty stock could not be declared unless certain reserves had been accumulated, and they could not be paid or credited during any period in which dividends had not been declared and paid upon withdrawable savings. The rate of dividends on guaranty stock was to be fixed by the board of directors.

On June 30, 1976, petitioners owned 17,459 shares of guaranty stock in Commerce. Of these shares, 1,390 shares were acquired on that day pursuant to a qualified stock option plan of Commerce. All of petitioners' stock in Commerce was held as community property.

Citizens Federal Savings & Loan Association of Seattle (Citizens or the association) is a federally chartered mutual savings and loan association which was authorized, organized, and chartered by the Federal Home Loan Bank Board under the provisions of 12 U.S.C. sec. 1461 et seq., and the regulations promulgated thereunder. Citizens has no capital stock. It is owned by its members who consist solely of savings account holders and borrowers. In the consideration of questions requiring action by its members, each holder of a savings account has one vote for each $100 (or fraction thereof) of the withdrawal value of his savings account, and each borrower has one vote.

The charter of Citizens states in part that the "objects of the association are to promote thrift by providing a convenient and safe method for people to save and invest money and to provide for the sound and economical financing of homes." Under the charter, Citizens has the power to raise capital only "by accepting payments on savings accounts representing share interests in the association." Generally speaking, requests for withdrawals from savings accounts must be honored within 30 days of the request. In this connection, Citizens' charter provides that: "Holders of savings accounts for which application for withdrawal has been made shall remain holders of savings accounts until paid and shall not become creditors." All savings accounts of Citizens are "nonassessable."

The Citizens charter further provides that as of June 30 and December 31 of each year, after provision has been made for

payment of expenses, credits to general reserves and surplus, and bonuses on savings accounts as authorized by Federal Home Loan Bank Board regulations, any remaining net earnings are to be distributed in proportion to the withdrawal value of savings accounts. In lieu of or in addition to such net earnings, any surplus of the association may be similarly distributed. In the event of voluntary or involuntary liquidation, dissolution, or winding up of Citizens, all holders of savings accounts are "entitled to equal distribution of assets, pro rata to the value of their savings accounts." Citizens has the power to redeem all or any part of its savings accounts at a price equivalent to "the full value thereof, as determined by the board of directors, but in no event shall the redemption price be less than the withdrawal amount" of any savings account.

On or about July 1, 1976, the guaranty stockholders of Commerce exchanged all of their stock for passbook accounts and time certificates of deposit in Citizens. This exchange was made in accordance with the provisions and intent of a "Plan for Merger" of Commerce and Citizens dated November 7, 1975.

Pursuant to the provisions of the plan for merger, each share of guaranty stock in Commerce was to be exchanged for a $12 deposit in a regular passbook savings account in Citizens, subject to the restriction that such deposits could not be withdrawn for a period of 1 year. Alternatively, Commerce shareholders had the option of exchanging their stock (at the same dollar rate per share) for time certificates of deposit in Citizens with maturities ranging from 1 to 10 years.[3] The plan for merger further provided that each prior shareholder of Commerce would have borrowing privileges against the deposits resulting from the exchange of stock at an interest rate 1.5 percent above the passbook rate.[4]

Upon completion of the exchange, Commerce was merged

---

[3]Although this option was within the intent of the parties to the merger, through a typographical error, the plan for merger does not reflect the terms of the option.

[4]Generally, Citizens savings account holders were charged interest at a rate 2 percent above the passbook rate on loans secured by their accounts. The passbook rate during the period July 1, 1976, through June 30, 1977, was 5.25 percent.

into Citizens and the combined business activity of the two was continued in the name of Citizens.[5] The exchange and merger were treated by Citizens and Commerce as a reorganization under section 368(a)(1)(A) resulting in no recognized gain or loss to Commerce shareholders pursuant to section 354(a).

On July 1, 1976, in accordance with the above-described plan for merger, petitioners exchanged the following shares of guaranty stock in Commerce for passbook accounts and time certificates of deposit in Citizens:

| Number of shares | Date of acquisition | Cost basis | Consideration received | | Gain realized |
|---|---|---|---|---|---|
| | | | Amount | Type | |
| 3,356 | 3/ 8/63 | $7,500 | $40,272 | Passbook | $32,772 |
| 3,359 | 6/26/70 | 7,500 | 40,308 | 2-year certificate | 32,808 |
| 3,358 | 12/31/71 | 7,500 | 40,296 | 18-month certificate | 32,796 |
| 3,358 | 10/24/72 | 7,500 | 40,296 | 18-month certificate | 32,796 |
| 667 | 1/ 1/73 | 7,530 | 8,004 | 1-year certificate | 474 |
| 1,971 | 2/19/74 | 6,000 | 23,652 | 3-year certificate | 17,652 |
| 861 | 6/30/76 | 7,500 | 10,332 | 3-year certificate | 2,832 |
| 529 | 6/30/76 | 5,772 | 6,348 | 4-year certificate | 576 |
| 17,459 | | 56,802 | 209,508 | | 152,706 |

Petitioners treated this exchange as one requiring the recognition of the gain realized only upon the withdrawal of moneys from the passbook accounts or upon the maturity of the time certificates of deposit. Therefore, they reported no gain from the exchange on their Federal income tax return for 1976.[6]

Respondent determined in the notice of deficiency that petitioners were required to recognize in 1976 the gain realized from the exchange of the Commerce stock for Citizens passbook accounts and time certificates of deposit.

Under section 1001,[7] the entire amount of any gain realized

---

[5]Each Commerce savings account outstanding on the effective date of the merger was converted to a savings account of the same size in Citizens.

[6]Petitioners had made no withdrawals from their passbook accounts between July 1, 1976, and the date that the stipulation was submitted. The record does not indicate whether petitioners had reported gain upon the maturity of any of the time certificates.

[7]SEC. 1001. DETERMINATION OF AMOUNT OF AND RECOGNITION OF GAIN OR LOSS.

(a) COMPUTATION OF GAIN OR LOSS.—The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized.

(b) AMOUNT REALIZED.—The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received. * * *

on the sale or exchange of property must be recognized for income tax purposes unless it is otherwise provided in the Code. Section 354(a)[8] provides in part that no gain shall be recognized if, pursuant to a plan of reorganization, stock or securities in a corporation that is a party to the reorganization are exchanged for stock or securities in another corporation that is a party to the reorganization.

As used in section 354(a), the term "reorganization" includes a merger or consolidation effected under applicable State or Federal law. Sec. 368(a)(1)(A); sec. 1.368–2(b)(1), Income Tax Regs. It is undisputed that the merger of Commerce and Citizens was effected as authorized by law. However, treatment of the merger as a "reorganization" for tax purposes does not necessarily follow from the fact that it was formally conducted in accordance with applicable law. There is an additional requirement, judicially created and now set forth in section 1.368–1(b), Income Tax Regs., that there be a "continuity of interest" on the part of those persons who owned the enterprise prior to the merger.[9] Generally speaking, this

---

*     *     *     *     *     *     *

(c) RECOGNITION OF GAIN OR LOSS.—In the case of a sale or exchange of property, the extent to which the gain or loss determined under this section shall be recognized for purposes of this subtitle shall be determined under section 1002.

[8]SEC. 354. EXCHANGES OF STOCK AND SECURITIES IN CERTAIN REORGANIZATIONS.

(a) GENERAL RULE.—

(1) IN GENERAL.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

(2) LIMITATION.—Paragraph (1) shall not apply if—

(A) the principal amount of any such securities received exceeds the principal amount of any such securities surrendered, or

(B) any such securities are received and no such securities are surrendered.

(3) CROSS REFERENCE.—For treatment of the exchange if any property is received which is not permitted to be received under this subsection (including an excess principal amount of securities received over securities surrendered), see section 356.

[9]For a review of the development of the continuity-of-interest test, see *West Side Fed. S. & L. Ass'n of Fairview Pk. v. United States*, 494 F.2d 404, 406–408 (6th Cir. 1974). See generally B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 14.11 (4th ed. 1979) (hereinafter B. Bittker & J. Eustice), discussing the evolution of the test and its application to not only mergers, but to the other types of transactions defined as "reorganizations" in sec. 368(a)(1).

means that the owners of an acquired corporation must receive a proprietary interest[10] in the modified enterprise resulting from a transaction which purports to be a "reorganization."[11] For purposes of this case, it means that, in order for us to find a "reorganization" and for section 354(a) to apply, the consideration received by petitioners in exchange for Commerce guaranty stock must be characterized as stock in Citizens.[12] See *Capital S. & L. Ass'n v. United States*, 221 Ct. Cl. 557, 607 F.2d 970, 973–974 (1979).

Not surprisingly, petitioners contend that they exchanged guaranty stock in Commerce for "stock" in Citizens pursuant to a plan of reorganization and that, under section 354(a), no gain was required to be recognized on the exchange. They emphasize that, like shareholders in a corporation that does issue "stock" in the traditional sense, holders of savings accounts in Citizens have voting rights, the right to pro rata distributions of earnings and surplus, and the right to share in Citizens' assets upon liquidation. See B. Bittker & J. Eustice, *supra* par. 14.31, at 14–94 and 14–95. In support of their position, petitioners also point out that section 7701(a)(7) and (8) defines the terms "stock" and "shareholder" as follows: [13]

(7) STOCK.—The term "stock" includes shares in an association, joint-stock company, or insurance company.

(8) SHAREHOLDER.—The term "shareholder" includes a member in an association, joint-stock company, or insurance company.

Respondent's position is that the merger of Commerce into Citizens was not a "reorganization" for tax purposes because petitioners and the other guaranty stockholders of Commerce

[10]The interest received is subject to both qualitative and quantitative restrictions. B. Bittker & J. Eustice, *supra* par. 14.11, at 14–20.

[11]The continuity-of-interest doctrine was devised as a means of denying tax-free status to otherwise taxable transactions (such as sales) that happen to meet the literal definition of a reorganization. B. Bittker & J. Eustice, *supra* at pars. 14.03, 14.11.

[12]Sec. 354(a) permits the receipt of "stock or securities" pursuant to a plan of reorganization; however, the receipt of securities *alone* will not satisfy the continuity-of-interest test. *LeTulle v. Scofield*, 308 U.S. 415 (1940). Petitioners and the other guaranty stockholders of Commerce received only one type of consideration from Citizens (i.e., savings accounts evidenced by passbooks and time certificates), and it must, therefore, be classified as "stock" if petitioners are to prevail.

[13]These definitions apply only "where not otherwise distinctly expressed or manifestly incompatible with the intent" of the provision in question. Sec. 7701(a). Thus, they are not necessarily determinative of the issue presented here. See *Carlberg v. United States*, 281 F.2d 507, 513–514 nn. 8 & 9 (8th Cir. 1960).

did not receive a significant proprietary interest in Citizens and that, therefore, section 354(a) has no application here. Respondent acknowledges that, to some extent, the savings accounts received by petitioners represent an equity interest in Citizens, but he emphasizes that they are not the equivalent of ordinary shares of stock. Rather, respondent argues, a savings account in Citizens is the equivalent of cash; he views the relationship between a savings account holder and Citizens as basically one of creditor and debtor because, he contends, for all practical purposes a Citizens savings account is withdrawable upon written demand.[14] Respondent would thus characterize a savings account in Citizens as "a hybrid interest, representing debt which is the equivalent of cash while, at the same time, having certain equity features" which are not sufficient to meet the requirements of the continuity-of-interest test in the circumstances of this case.[15]

The question whether savings accounts in a federally chartered mutual savings and loan association may be characterized as "stock" for purposes of the provisions of the Internal Revenue Code relating to tax-free reorganizations has not heretofore been considered by this Court. However, the issue has been decided by a number of other courts, and they have uniformly rejected the position here taken by respondent.

In *Everett v. United States*, 448 F.2d 357 (10th Cir. 1971), a State-chartered building and loan association with both "permanent shares" and "savings shares" outstanding had transferred its assets to a federally chartered mutual savings and loan. Holders of savings shares in the State association received like shares in the Federal association. In addition, $65,000 was paid to the State association and distributed to its permanent shareholders in a complete liquidation. The tax-

---

[14]Respondent minimizes the effect of the 1-year restriction on withdrawal from the savings accounts received by the guaranty stockholders of Commerce by emphasizing that they had borrowing privileges against those deposits.

[15]See Rev. Rul. 69–6, 1969–1 C.B. 104. Respondent has ruled, however, that the proprietary interest represented by savings accounts such as the ones in question is sufficient for purposes of the continuity-of-interest test in cases involving the merger of two mutual savings and loan associations. See Rev. Rul. 69–3, 1969–1 C.B. 103; Rev. Rul. 78–286, 1978–2 C.B. 145 (continuity-of-interest test satisfied even in the absence of voting rights). Cf. Rev. Rul. 69–646, 1969–2 C.B. 54 (merger of building and loan association having only savings accounts into one having savings accounts and guaranty shares held to satisfy the continuity-of-interest requirement).

payers treated the transaction as a reorganization within the meaning of section 368(a)(1)(C) and (2)(B), and the correctness of their so doing turned on the question whether savings shares in the Federal association constituted "voting stock" within the meaning of that section. The court held that they did, noting that although "such shares have some of the indicia of a creditor-debtor relationship, nevertheless at the same time such shares also possess many of the attributes of a proprietary type interest."[16] *Everett v. United States, supra* at 360. The court went on to hold that the transaction met the continuity-of-interest test[17] even though the permanent shareholders of the State association had been "cashed out."

A similar conclusion was reached in *West Side Fed. S. & L. Ass'n of Fairview Pk. v. United States*, 494 F.2d 404 (6th Cir. 1974) (hereinafter *West Side*), which in all material respects is identical to the case before us. There, the issue was whether the statutory merger of a State-chartered savings and loan into a federally chartered mutual savings and loan was a "reorganization" within the meaning of section 368(a)(1)(A). Each savings account in the State association had been exchanged for a savings account of equal value in the Federal association, and each share of capital stock in the State association had been converted into a savings account in the Federal association with a withdrawal value of $2,500. The Government argued that this transaction failed to meet the requirement of a continuity of proprietary interest, stressing the fact that prior to the merger, the State association had two distinct classes of contributors to its capital. It also emphasized the fact that (1) savings accounts in the Federal association were withdrawable at any time with little or no restriction, (2) such savings accounts were federally insured, and (3) voting rights attaching to such savings accounts were more restricted

---

[16]The proprietary rights focused on by the court—i.e., the right to vote and participate in management, the right to bonus payments contingent on earnings, and the right to share in liquidation proceeds—were basically the same as those possessed by holders of savings accounts in Citizens.

[17]It should be noted that the requirement of sec. 368(a)(1)(C) that an exchange be "solely" for "voting stock" is stricter than the judicially created continuity-of-interest doctrine. See *Helvering v. Southwest Consolidated Corp.*, 315 U.S. 194, 198 (1942).

than the rights enjoyed by the former shareholders of the State association.

The court in *West Side* emphasized that cases dealing with the continuity-of-interest requirement have focused upon the nature of the interest received and that it need not be identical to the interest given in an exchange.[18] This being so, and because a savings account is the only proprietary interest available in a Federal mutual savings and loan association, the court stated that "it is improper to ignore the proprietary rights * * * [of holders of these savings accounts] and concentrate only on their rights as creditors." 494 F.2d at 411. The court held that the exchange of savings accounts and stock in the State association for savings accounts in the Federal association satisfied the continuity-of-interest test. Specifically, it found that each owner of a proprietary interest in the State association had acquired a proprietary interest in the Federal association which was definite and material and which represented a substantial part of the value of the stock that was given up.

The same result was reached by the Court of Claims in *Capital S. & L. Ass'n v. United States*, 221 Ct. Cl. 557, 607 F.2d 970 (1979) (hereinafter *Capital*), also involving the question whether the merger of a savings and loan association having guaranty stock into a mutual savings and loan association[19] qualified as a reorganization under section 368(a)(1)(A). Pursuant to an agreement of merger, all savings accounts and guaranty stock of the acquired association were converted into voting withdrawable savings accounts in the mutual association. The Government argued that the holders of guaranty stock had "cashed in" or sold their equity interest by accepting withdrawable savings accounts in exchange for the stock and that, therefore, the merger failed to meet the continuity-of-interest test.

The Court of Claims observed that there were several

---

[18]The court concluded its opinion with a quote from *Helvering v. Minnesota Tea Co.*, 296 U.S. 378, 386 (1935), as follows: "True it is that the relationship of the taxpayer to the assets conveyed was substantially changed, but this is not inhibited by the statute."

[19]Apparently, both of the savings and loan associations that were parties to the merger in *Capital S. & L. Ass'n v. United States*, 221 Ct. Cl. 557, 607 F.2d 970 (1979), were incorporated under the laws of the State of Washington, as was Commerce.

problems with the Government's argument that savings accounts in mutual savings and loan associations should be treated simply as debt interests, "beginning with the fact that these accounts are hybrid interests having the seemingly inapposite characteristics of both equity interests and debt interests." *Capital S. & L. Ass'n v. United States*, 221 Ct. Cl. at 564, 607 F.2d at 974. As in *West Side Fed. S. & L. Ass'n of Fairview Pk. v. United States, supra,* the court noted that in cases involving the continuity-of-interest doctrine the focus must be on the nature of the interest received in an exchange and that savings accounts are the only interests with proprietary and equity rights available in a mutual savings and loan. In holding that the merger in question did qualify as a reorganization under section 368(a)(1)(A), the Court of Claims stated (*Capital S. & L. Ass'n v. United States*, 221 Ct. Cl. at 567, 607 F.2d at 976):

As the law assumes that someone must own an association or corporation, we join the courts in *West Side, supra,* and *Everett, supra,* in refusing to reach a decision which illogically implies that * * * [a mutual savings and loan association is] without owners and which may unduly hinder otherwise desirable reorganizations. Though savings accounts are easily converted into cash, as long as the account remains unliquidated, its holders continue their equity investment in the association in the form of share accounts. * * * [Fn. ref. omitted.]

Thus, in these and other cases,[20] the courts have uniformly rejected respondent's argument that the receipt of savings accounts in a mutual savings and loan association in exchange for stock will not satisfy the continuity-of-interest test. The courts have recognized the hybrid nature of accounts in mutual savings and loan associations but have concluded that such proprietary rights as the right to vote, the right to receive pro rata distributions of earnings, and the right to share in distributions of assets upon liquidation are sufficient to cause such accounts to meet the continuity-of-interest requirement.

---

[20]In addition to *Everett, West Side,* and *Capital,* cases holding that a savings account in a mutual savings and loan constitutes "stock" for purposes of finding a reorganization include *Rocky Mtn. Fed. Sav. & L. Ass'n v. United States,* 473 F. Supp. 779 (D. Wyo. 1979) (merger of State stock savings and loan into Federal nonstock savings and loan), and *First Federal Sav. & Loan Ass'n v. United States,* 452 F. Supp. 32 (N.D. Ohio 1978) (same).

It has also been recognized outside the area of reorganizations that savings accounts in mutual savings and loan associations represent equity interests. See the discussion and cases cited in *Capital S. & L. Ass'n v. United States,* 221 Ct. Cl. at ___ , 607 F.2d at 975.

Respondent cites only one case involving this question in support of his position, *Home Savings & Loan Ass'n v. United States*, 514 F.2d 1199 (9th Cir. 1975), and that case—involving guaranty stock associations on both sides of the merger transaction—is readily distinguishable from cases like the instant one where stock in a savings and loan association was exchanged for savings accounts in a mutual savings and loan.[21]

We recognize that respondent is not without arguments and that treating savings accounts as "stock" for purposes of the "tax-free" reorganization provisions of the Internal Revenue Code raises a number of logical and practical administrative problems.[22] If this were a question of first impression, we

---

[21]In *Home Savings & Loan Ass'n v. United States*, 514 F.2d 1199 (9th Cir. 1975), the taxpayer, a State savings and loan association having guaranty stock in addition to "withdrawable shares," acquired two other State guaranty stock savings and loan associations in a transaction that it characterized as a reorganization. Home first purchased for cash all of the outstanding guaranty stock of the two acquired associations. Subsequently, the acquired associations were merged into Home. Upon the merger, the guaranty stock of the acquired associations was cancelled, and the holders of "withdrawable shares" and "investment certificates" in the acquired associations exchanged them for "withdrawable shares" in Home. Based primarily upon California law and the terms of the instruments before it, the court held that the withdrawable shares and investment certificates of the acquired associations could not be considered as "stock" for purposes of sec. 368(a)(1)(A). Rather, they were found to be debt instruments and, because the former owners of the acquired associations (i.e., the guaranty stockholders) had been "cashed out," the transaction was held to lack the continuity of interest requisite to a valid "reorganization."

In the present case, the question whether the holders of savings accounts in the acquired association (Commerce), as well as its guaranty stockholders, may be considered as its former owners is not in issue. Here, the question whether there is a sufficient continuity of interest depends upon the nature of the savings accounts that the guaranty stockholders received from Citizens, a mutual savings and loan association having only savings accounts and no stock per se. The Ninth Circuit in *Home Savings & Loan Ass'n v. United States, supra* at 1208–1209, made it clear that the nature of such savings accounts was not there in issue, stating in this connection that:

"Assuming that there must exist in all associations a proprietary interest, such broad and uniform interest may well serve that purpose. Its capacity to do so should not be impaired by the fact that it also may constitute debt. However this may be, we are not confronted here with such a case. [Fn. ref. omitted.]"

[22]For example, the general purpose of the reorganization provisions is to postpone the recognition of gain realized upon the shifting of business interests into a modified corporate form. Thus, under sec. 358(a)(1), the basis of property received in a reorganization exchange (here, the savings accounts) is the same as the basis of the property surrendered (the guaranty stock). The amount of petitioners' bases for their several blocks of stock, as shown above, is much less than the amounts in the savings accounts they received, and yet, practically speaking, savings accounts are viewed as the equivalent of cash.

Petitioners suggest that the gain realized from the exchange of guaranty stock for savings accounts should be recognized only upon withdrawals from the passbook accounts and upon the maturity of the time certificates. (It is unclear as to whether petitioners suggest that the

would feel free to give greater weight to those problems in reaching our decision. Given the long outstanding and unbroken line of holdings of the several cited judicial authorities, however, that savings accounts in a mutual savings and loan association qualify as "stock," we feel constrained to follow the guidance of those decisions, the first of which is now over 10 years old. A corporate reorganization, in which the stakes are usually very high, requires careful advance planning and, consequently, the need for certainty in the law is great. The practicality of many reorganizations is materially affected, if not determined, by the tax consequences, and the participants need to know the ground rules. The current plight of the savings and loan industry[23] brings to mind Justice Powell's statement in *United States v. Byrum*, 408 U.S. 125, 135 (1972): [24]

When a principle of taxation requires re-examination, Congress is better equipped than a court to define precisely the type of conduct which results in tax consequences. When courts readily undertake such tasks, taxpayers may not rely with assurance on what appear to be established rules lest they be subsequently overturned. Legislative enactments, on the other hand, although not always free from ambiguity, at least afford the taxpayers advance warning.

## We hold for petitioners.[25]

---

time certificates should be taxed upon maturity even though the funds are not withdrawn.) The withdrawal from a savings account does not constitute a "sale or exchange" as those terms are generally understood, but such withdrawals could be viewed as the proceeds of redemptions to be tested under the provisions of sec. 302(b). If both deposits and withdrawals were made with respect to savings accounts received in an exchange for stock, i.e., unless the accounts received in the reorganization are kept carefully separate, serious problems of determining the shifting bases of the accounts and the character of the withdrawals will arise.

In the final analysis, however, given the hybrid nature of the savings accounts in question, logical and practical problems would arise regardless of whether the accounts are treated as a debt interest or as an equity interest.

[23]See, e.g., H. Rept. 97-201, to accompany H.R. 4242 (Pub. L. 97-34), at 145-146 (1981); Wall Street Journal, Feb. 18, 1982, at 4, cols. 1 and 2; Washington Post, Feb. 22, 1982, at A1, col. 3 and A12, col. 1.

[24]Paraphrasing the words of the Supreme Court in *United States v. Byrum*, 408 U.S. 125, 134 n. 8 (1972), we are not so much concerned with whether petitioners relied on the precedents discussed herein, but with the probability that others have relied on them in good faith in planning and carrying out mergers of savings and loans. At least with respect to the question of the character of savings accounts in a federally chartered mutual savings and loan, a uniform rule should be applied nationwide. See and compare *Allstate Sav. & Loan Ass'n v. Commissioner*, 600 F.2d 760, 762 (9th Cir. 1979), affg. 68 T.C. 310 (1977).

[25]Respondent has made an alternative argument that, if the receipt of savings accounts in Citizens is sufficient for purposes of the continuity-of-interest test, the accounts nonetheless

To reflect the foregoing,

*Decision will be entered for the petitioners.*

constitute "other property" (boot) for purposes of sec. 356(a)(1) and, therefore, result in recognized gain to petitioners. Respondent submits that this argument is consistent with the decisions of the courts in *Everett, West Side,* and *Capital.*

Although respondent's alternative argument may in the abstract be consistent with the holdings of those cases, we think the argument fails to comport with the facts of either those cases or the present case. Sec. 356(a)(1) applies where property qualifying for "tax-free" exchange under sec. 354 and, *in addition,* some other property or money is received. Here, petitioners received only one type of property, savings accounts (in the form of passbooks and time certificates), and the cash deposit and proprietary rights represented by those accounts are not separable. See *Capital S. & L. Ass'n v. United States,* 221 Ct. Cl. at ___·, 607 F.2d at 977. Respondent seems to have recognized as much in Rev. Rul. 69–6, 1969–1 C.B. 104, where it is stated that the obligation of a Federal nonstock mutual association to deliver cash deposits "is not severable from its obligation to deliver * * * a proprietary interest. Both the cash equivalents and the proprietary interests are evidenced" by savings accounts. Given this inseparability of rights, we think this case must turn solely on the question whether the savings accounts are "stock." We find no merit in respondent's alternative argument.